A97A0131, A97A0132. IN THE INTEREST OF T. B. R. et al., children
(two cases).
(480 SE2d 901)

ELDRIDGE, Judge.

Appellants Melissa Henderson ("Henderson") and James Robison ("Robison"), parents of two minor children, individually challenge the termination of their parental rights. For the reasons set forth below, we affirm the decision of the trial court.

Henderson is a 28-year-old woman with a ninth grade education. In the ten years since she became 18, she has held two brief jobs. She claims that her lack of employment is primarily a result of the fact that she has been incarcerated for seven of the past ten years for various felonies.

Henderson has four children; her two youngest children are the subject of the proceedings at issue. Her oldest child, a son, was born when she was 16 years old; he has lived with his maternal grandmother (Henderson's mother) his entire life. Henderson's second child, a daughter, was born in 1987; Henderson gave the child to a male acquaintance when the child was only two months old. The child is now nine years old and continues to live with this man, although there has been no formal adjudication assigning custody of the child. Henderson maintains that she has had some contact with both of these children, sending them cards and small gifts, but has never provided any significant financial support.

Henderson and Robison began cohabitating in 1987 and are common law spouses. Henderson testified that, during the four years that they lived together, Robison often abused alcohol and used intravenous and other drugs; she admitted using drugs with him. Neither appellant maintained steady employment, even though Henderson admitted that she was physically able to work. Instead, Henderson chose to forge checks, a crime for which she was convicted twice in 1988; she served over 15 months for the second conviction. Following her release from prison, Henderson was convicted of DUI, but apparently did not serve additional jail time.

Appellants' daughter, T. B. R., was born in 1990, and their son, J. L. R., was born 11 months later in 1991; these children are the subjects of the case sub judice. When J. L. R. was only three weeks old, Henderson was involved in a robbery during which a 77-year-old man was killed. Immediately after the slaying, she traveled to Tennessee in order to elude the police, leaving her two children, both less than a year old, with their father, who she admits was abusing alco-

hol and drugs. Henderson was subsequently convicted by a jury of voluntary manslaughter and theft by taking and was sentenced to concurrent 20-year terms of incarceration.

Shortly thereafter, Robison also became incarcerated. The Georgia Department of Human Resources Division of Family & Children Services ("DFCS") gained temporary custody of the children and placed them in a foster home. When Robison was released from custody later that year, DFCS returned the children to him. Robison kept the children from 1991 until he was again incarcerated in 1994. While he had custody of the children, they were often homeless, living in cars or with relatives. In 1993, DFCS followed up on a report that Robison was sexually abusing T. B. R.; the results of the investigation were "undetermined," and he was not charged. Robison was also accused of stealing welfare checks and tax refund checks to support his drug habit. When he was incarcerated again in 1994, DFCS regained custody of the children.

DFCS attempted to place the children with relatives of appellants; however, no suitable, willing relatives were identified.[1] Eventually, the children were placed in a foster home in Cobb County. In 1995, a Cobb County DFCS caseworker arranged for the children to visit with their mother at the prison. From Henderson's incarceration in 1991 until this visit was arranged in 1995, Henderson had no contact with the children. She had provided no support and had not communicated with them. The young children did not know their birth mother; they referred to their foster mother as "mom" and referred to Henderson as "Melissa." Since the initial visit, Henderson has visited with them two or three additional times, although she claims to write them often.

In November 1995, Henderson wrote a letter to DFCS in which she admitted that the children were better off with the foster family and agreed to consent to their adoption. However, Henderson later changed her mind and refused to give her consent. In the meantime, a citizen panel that reviewed the case status of T. B. R. and J. L. R. recommended to DFCS that the parental rights of Henderson and Robison be terminated.[2]

DFCS moved to terminate appellants' parental rights on March 1, 1996. After several unsuccessful attempts to locate Robison, DFCS

---

[1] DFCS attempted to place the children with Robison's grandmother, but she was too frail to keep them. The children were then placed with relatives who were related by marriage to Robison; the relatives returned the children to DFCS when a serious family illness made them unable to care for the children. Another couple that was related to Robison kept the children for only four days before calling another foster family to pick them up on Thanksgiving Day 1995.

[2] DFCS conducts citizen panel case reviews every six months for each child as long as they are in DFCS custody.

petitioned the court to allow service by publication, as allowed by OCGA §§ 15-11-29 and 9-11-4 (e) (1); the petition was granted and service was effected on May 3, 1996. A hearing was held on May 8, 1996; Henderson, represented by court-appointed counsel, appeared and testified. Two caseworkers from DFCS testified also. On July 1, 1996, an order terminating appellants' parental rights was granted. Appellants both filed timely appeals.

*Case No. A97A0131*

(480 SE2d 860)

Henderson asserts that the termination of her parental rights was not supported by sufficient evidence, was based on past history that does not support an inference of present unfitness, disregarded evidence of her present ability to care for her children, and is against legal precedent.

The standard of review of a juvenile court's decision to terminate parental rights is " ' "whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." ' " *In the Interest of A. O. A.*, 172 Ga. App. 364, 365-366 (323 SE2d 208) (1984), quoting *Blackburn v. Blackburn*, 249 Ga. 689, 694 (292 SE2d 821) (1982); see also *In the Interest of A. M. V.*, 222 Ga. App. 528 (474 SE2d 723) (1996); *In the Interest of J. M. D.*, 221 Ga. App. 556 (472 SE2d 123) (1996); *In the Interest of S. L. W.*, 221 Ga. App. 509, 510 (471 SE2d 579) (1996) (holding that the "reviewing court is to defer to the lower court in the area of factfinding and should affirm" unless this standard is not met). Clear and convincing evidence is that intermediate standard of proof between "preponderance of the evidence" and "beyond a reasonable doubt." *Clarke v. Cotton*, 263 Ga. 861 (440 SE2d 165) (1994); see also *In re Estate of Burton*, 265 Ga. 122, 123 (453 SE2d 16) (1995); *Gen. Motors Corp. v. Moseley*, 213 Ga. App. 875, 886 (447 SE2d 302) (1994). In a termination case, "[t]his standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior." (Citations and punctuation omitted.) *In the Interest of D. S.*, 217 Ga. App. 29, 31 (456 SE2d 715) (1995); see also *Santosky v. Kramer*, 455 U. S. 745, 758-759, 769 (102 SC 1388, 71 LE2d 599) (1982) (holding that since a " 'parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one,' " the use of a " 'preponderance of the evidence' standard . . . is inconsistent with due process." The Court noted that a higher evidentiary standard will reduce factual errors and may reduce wrongful terminations, while conveying to the factfinder "the

level of subjective certainty about his factual conclusions necessary to satisfy due process.").

In examining the evidence in the light most favorable to appellee, the State of Georgia and DFCS, there is more than sufficient clear and convincing evidence in the case sub judice for a rational factfinder to determine that Henderson's parental rights should be terminated and that such termination is in the children's best interests.

1. (a) The first factor in the determination of parental misconduct or inability is whether the children are deprived. In 1994, the children were determined to be deprived and were taken into custody by DFCS. This deprivation order has been renewed at least one time, and has not been appealed by either parent. Therefore, both appellants are bound by this finding of deprivation and the first factor is satisfied. *In the Interest of J. M. D.*, 221 Ga. App. at 558; *In the Interest of S. L. W.*, 221 Ga. App. at 512.

(b) Turning to the second factor, in determining if there has been a lack of proper parental care or control which caused the deprivation, the trial court must consider evidence of convictions and incarcerations that have a "demonstrable negative effect" on the parent-child relationship. OCGA § 15-11-81 (b) (4) (B) (iii). "Although imprisonment alone does not always compel a termination of parental rights, it will support such a ruling when adequate aggravating circumstances are shown to exist." (Citations and punctuation omitted.) *In the Interest of L. F.*, 203 Ga. App. 522 (417 SE2d 344) (1992). These aggravating circumstances may include a " 'criminal history of repetitive incarcerations for the commission of criminal offenses or parole violations, [which] constitutes an additional factor which may be considered in determining whether the child *presently* is without the proper parental care and control of the offending parent, and that such is likely to continue. (Cit.)' " Id.

In the case sub judice, the evidence shows that Henderson has committed four felonies since 1988. Even though she was incarcerated for over 15 months in 1988 and 1989, she quickly returned to a life of crime. This is in spite of the fact that she delivered two children between 1990 and 1991.

Henderson is currently incarcerated for the 1991 voluntary manslaughter of a 77-year-old man during a robbery. To exacerbate the seriousness of the crime, Henderson, in an apparent attempt to avoid prosecution for this crime, abandoned her eleven-month-old daughter and three-week-old son, leaving them with her common law husband, Robison, who Henderson herself acknowledges has a history of intravenous drug abuse, unemployment, and crime.

Henderson has been incarcerated for almost the entire lives of the children at issue here. They have been moved from one foster

home to another, have been homeless, neglected, and possibly abused while in the custody of their father. They are at risk of experiencing the symptoms of foster care drift. Henderson admits that the children are suffering and that the primary reason she does not care for her children is her incarceration; for these reasons, she even agreed to give up the children for adoption. A DFCS caseworker testified that exposure to the prison environment during the children's visitations with their mother is harmful. Based on this evidence, a rational factfinder could certainly conclude that the children are deprived and suffering as a result of Henderson's incarceration.

However, there is additional evidence of another factor that the court must consider in determining whether there has been parental misconduct: evidence of *"past* [or present] physical, mental, or emotional neglect of the child *or of another child* by the parent." (Emphasis supplied.) OCGA § 15-11-81 (b) (4) (B) (v).

In the case sub judice, Henderson not only abandoned the children at issue in this action when she fled to Tennessee following her 1991 crime, she has also abandoned her two older children, leaving one with her mother to raise and the other, at two months of age, with a male acquaintance. She has consistently failed to support them financially, even when she was not incarcerated. These facts clearly support a finding that Henderson lacked, and continues to lack, "proper parental care and control."

(c) The third issue to be considered is whether the causes of the deprivation will continue. In addition to evidence of present parental misconduct or inability, "evidence of past conduct may be considered in determining whether the deprivation would be likely to continue. . . ." *In the Interest of A. M. V.*, 222 Ga. App. at 531; *In the Interest of B. J.*, 220 Ga. App. 144, 146 (469 SE2d 313) (1996).

During the turbulent four-year period before her incarceration in 1991, Henderson has admitted to using drugs, possibly even intravenous drugs. She was convicted of three felonies, including forgery and DUI, and served over fifteen months in prison in 1988. Yet she was pregnant at least eighteen months of this period with the two children at issue in this case. One can reasonably infer from these facts that Henderson participated in dangerous and illegal conduct while pregnant and/or while caring for one or more infants. This conduct exhibits an alarming lack of concern for the safety and well-being of her children.

The evidence, viewed in the light most favorable to the appellee, indicates that Henderson has never been solely responsible for a child for longer than a year and, contrary to her assertions, has voluntarily abandoned all four of her children, leaving them with her mother, her drug-abusing husband, or an acquaintance. The evidence demonstrates that Henderson seems to have trouble accepting

responsibility for anything in her life, blaming her failure to support her children on her frequent incarcerations, her failure to work despite her ability to do so, and her history of drug use, all unfortunate circumstances for which she is completely and solely responsible.

Appellant asserts that her past history is irrelevant to her present fitness as a parent. We strongly disagree. Her history of child abandonment is clearly relevant when appellant, aware of her past failings, continues to ignore her responsibility to financially support her children. This is clearly present conduct from which a factfinder can infer that appellant, in spite of a recent, albeit questionable, change of heart, is not prepared to support her children in the future.

Further, even though she has been incarcerated for five years, Henderson has only recently begun to prepare for her future by pursuing a GED and taking drug abuse and parenting classes. While this may indicate an attempt to comply with the DFCS reunification plan, it falls very short of negating years of abandonment and harmful neglect. See *In the Interest of M. N. L.*, 221 Ga. App. 123, 124 (470 SE2d 753) (1996).

However, Henderson testified that she has been "approved" for release to a half-way house sometime in the future; she later admitted that she has only applied for the program and considers herself to be "eligible" for approval. Henderson also testified that she hopes to be paroled in 1998, but her opportunity for parole is uncertain, since Henderson has been disciplined while in prison for possession of contraband, a situation she seems to dismiss as a minor infraction. Even if paroled in 1998, Henderson has done little to prepare for the tremendous responsibility of supporting two young children, assuming she continues to avoid financial support of her two older children. While "[t]he mother's efforts to improve herself during her imprisonment are good . . . the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citations and punctuation omitted.) *In the Interest of M. N. L.*, 221 Ga. App. at 124.

Further, the trial court is certainly justified in giving Henderson's assertions of sudden parental fitness minimal consideration, since her testimony before the trial court is wrought with contradictions and with vague, self-serving, unsubstantiated claims and excuses. For example, Henderson claimed that she only forged checks to support her family, but then admitted during her testimony that the forgery occurred when she went on a "shopping spree" with a friend to buy new clothes; this shopping spree occurred in 1988, a time when Henderson had no children at home, having already abandoned her older son and daughter. Further, she first asserted that her common law husband did not have a drug problem, although she

admitted he used cocaine and intravenous drugs; she then denied using drugs with him, but changed her story when presented with the conflicting evidence in the form of a 1991 letter she had written to DFCS. She also testified that her husband did not steal money to purchase drugs, yet had accused him in the same 1991 letter of stealing welfare and tax refund checks, crimes about which she testified only when confronted with the letter. She even attempted to deny that she had written the letter, although she finally admitted that it was in her handwriting. Finally, when asked about the first child that she had abandoned, she claimed to have cared for her son for five years, which would have been from 1984 until 1989. Yet during that same period she claimed to be living with Robison, without her older children. Such testimony is directly contradictory and may be construed against Henderson, since she offered no reasonable explanation for the discrepancies. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (343 SE2d 680) (1986). Further, the trial court heard all of the evidence presented; it is the role of the factfinder, not the appellate courts, to judge the credibility of a witness or the lack thereof and to decide whether to disregard the testimony. *Tankesley v. Thompson*, 220 Ga. App. 641, 642 (469 SE2d 853) (1996). Considering all of the circumstances, a rational factfinder could determine that the deprivation of T. B. R. and J. L. R. is likely to continue.

(d) Finally, a court must determine if the continued deprivation "will cause or is likely to cause serious physical, mental, emotional, or moral harm to the [children]." OCGA § 15-11-81 (b) (4) (A) (iv). In the case sub judice, the DFCS caseworker testified that, due to their unstable lifestyle and multiple relocations, the children are at risk of developing "foster care drift," a condition that prevents children from forming emotional attachments with others. This syndrome results from frequently moving children among several different foster homes. Further, five-year-old J. L. R. is developing aggressive, antisocial behavior as a result of his unstable lifestyle, which is certainly harmful and, if the problem is not addressed soon, could possibly result in his being more difficult to place in an adoptive home in the future.

Still, Henderson is asking the court to delay a permanent placement of the children until her possible release in 1998, when the children will be ages seven and eight. The DFCS caseworker testified that the children will become "less adoptable" as they get older, reducing the chances of a permanent placement if Henderson, once again, has a change of heart and abandons the children. While DFCS is "obligated to pursue alternatives to termination, which it did in this case, . . . it is not obligated to gamble the [children's] prospects for a good life on the possibility that the mother will emerge from prison in two [or more] years reformed to the point that she can take

care of [the children] and provide [them] with a stable home." *In the Interest of M. N. L.*, 221 Ga. App. at 125.

Thus, this Court finds that the evidence as presented amply supports a determination that T. B. R. and J. L. R. already have been harmed and that they will continue to be harmed unless affirmative steps are taken to end the deprivation and place these children in a stable, permanent environment. This is best accomplished by terminating Henderson's parental rights.

2. In so finding, we now address the second prong of the statutory requirements of OCGA § 15-11-81 (a), that such termination would serve the best interests of the children. The evidence presented paints a bleak picture of the children's unstable past of neglect, exposure to crime and illegal drugs, possible abuse, and frequent, disruptive relocations. The possibility of a future filled with such instability is very high, considering Henderson's reckless past, irresponsible present, and unpredictable future. At a minimum, she will be in the state's custody for another two years, and will emerge from the experience with minimal job skills, no real employment history, four felony convictions, eight and one-half years of past incarceration, a history of drug abuse, minimal contributions from her family, no spousal support, and at least two, if not four, dependent children to feed, clothe, discipline, educate, and protect. Placing T. B. R. and J. L. R. in a home where the potential for failure is so profound is avoidable and, therefore, unnecessary.

The children are currently adoptable and, with appropriate attention, may escape the permanent ravages of the deprivation that has otherwise disrupted their entire lives. Thus, we conclude that there is more than sufficient clear and convincing evidence that it is in the children's best interest that Henderson's parental rights be terminated. We affirm the judgment of the trial court as to the termination of Henderson's parental rights.

### Case No. A97A0132

Appellant Robison, the children's father, appeals the termination of his parental rights, asserting that much of the evidence was inadmissible and therefore insufficient to support such termination. He bases this assertion in part on the claim that he did not receive actual notice of the termination hearing, so that he was unrepresented at the hearing;[3] he did not have an opportunity to cross-

---

[3] Robison asserts that he was entitled to be represented by legal counsel at the hearings pursuant to OCGA § 15-11-30 (b). While Robison was certainly entitled to retain private counsel, he never requested court-appointed counsel and was not entitled to court-appointed counsel absent a showing that he was indigent. OCGA § 15-11-30 (a), (b).

examine the witnesses against him; he did not have the opportunity to object to the testimony at the hearing; and therefore, he was denied due process.

3. OCGA § 15-11-27 (b) allows a court to order service by publication of the summons to a termination hearing if, after *reasonable effort*, a party cannot be personally served and his mailing address cannot be ascertained. See also OCGA §§ 9-11-4; 9-11-5; 15-11-83 (b). The statutory requirements are consistent with the United States Supreme Court's holding that, in order to satisfy due process requirements, notice must be reasonably calculated, *under all of the circumstances*, to afford parties an opportunity to be heard. *Mullane v. Central Hanover Bank &c. Co.*, 339 U. S. 306, 314 (70 SC 652, 94 LE 865) (1950). Contrary to Robison's assertions, a party does not have an absolute right to personal service or actual notice of an action against them; such a holding would only encourage parties to become unavailable for service of process and permanently derail impending legal action. Georgia law has never required such diligence in any type of legal proceeding.

In support of its request to serve Robison by publication, appellee filed an affidavit with the court asserting that, despite DFCS's due diligence, Robison could not be found and could not be served at his last known address. In addition, DFCS caseworkers testified at the hearing that Robison had failed to contact DFCS about his children for over a year and had failed to keep caseworkers apprised of his change of address. Robison apparently abdicated his parental responsibilities to the state in 1994; now he complains that the state did not make extraordinary, perhaps even futile, efforts to locate him. Such expectations are without statutory support and would place an undue burden on DFCS, particularly in a case where a parent's extended and unexplained absence is one basis for the termination proceeding.[4] Under the notice provisions of OCGA § 15-11-27, the court did not err in allowing service of Robison by publication.[5]

4. In addition to supporting the trial court's decision to allow service by publication, the extensive evidence of Robison's lack of contact with his children and DFCS also supports the termination of

---

[4] Compare *Crenshaw v. Crenshaw*, 267 Ga. 20, 21 (471 SE2d 845) (1996) (holding that notice by publication was not reasonably designed to ensure that a pro se party received such notice and was inadequate to meet due process requirements when the court had a current out-of-state address of a party in a divorce action); see also *Green v. Green*, 263 Ga. 551, 559 (437 SE2d 457) (1993) (Sears, J., concurring specially).

[5] This Court notes that, although Robison claims that he had no notice of the termination hearing, he somehow received notice of the termination order and was able to hire an attorney and file an appeal within 30 days of the order. Such expediency leads to an inference that notice of the hearing was properly served, despite assertions to the contrary, since notice of the hearing and the judgment were provided in the same manner.

Robison's parental rights. In determining whether the child is without "proper parental care and control," as required to support a termination order under OCGA § 15-11-81 (b) (4) (A) (ii), "the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) [t]o communicate or make a bona fide attempt to communicate with that child in a meaningful, supportive, parental manner; (ii) [t]o provide for the care and support of the child as required by law or judicial decree; and (iii) [t]o comply with a court ordered plan designed to reunite the child with the parent or parents." OCGA § 15-11-81 (b) (4) (C) (i)-(iii). All of these factors are present in the case sub judice.

DFCS caseworkers testified that they repeatedly tried to reach Robison through relatives and friends, but he never returned their calls; in fact, Robison made no attempt to contact DFCS concerning his children in over a year prior to the hearing. He has provided no financial support, and has completely failed to comply with the goals of the family reunification plan developed by DFCS. See *In the Interest of S. L. W.*, 221 Ga. App. at 510.

Robison points to vague references in the testimony that support his contention that he did, in fact, contact the children on Christmas 1995, while they were visiting his grandmother. While such visit may have taken place, it certainly does not rise to the level of "a bona fide attempt to communicate . . . in a meaningful, supportive, parental manner." OCGA § 15-11-81 (b) (4) (C) (i). The testimony indicates that the children, after being surprised by an unexpected visit from their father, suffered recurring nightmares. This lone, questionable attempt to communicate with his children does little to support Robison's case. Even if its consideration was limited solely to the evidence of Robison's abandonment of the children, the trial court was justified in finding that the provisions of OCGA § 15-11-81 were fulfilled and in terminating Robison's parental rights.

However, there is significant additional evidence of Robison's parental unfitness that bolsters the trial court's order. The evidence indicates that Robison has a history of drug and alcohol abuse, including the use of intravenous drugs. From 1991 until he was incarcerated in 1994, Robison had custody of the children and failed to provide a stable home, repeatedly relocating the family between relatives, motels, and sometimes living in his car. Further, Robison was accused of sexually abusing his three-year-old daughter in 1993, although the abuse could not be confirmed. Finally, Robison has had numerous felony incarcerations and has been accused of stealing the tax refund and welfare checks of others, including his daughter, in order to support his drug habit.

Robison characterizes Henderson's testimony regarding his his-

tory of drug abuse and criminal activity as inadmissible hearsay. However, most of Henderson's testimony was based on her personal knowledge of Robison's drug use during their period of cohabitation prior to her 1991 incarceration, and was not hearsay. Henderson's related testimony about her joint participation in Robison's drug use was, in fact, an admission against her interest, which supports the reliability of the statements. See OCGA § 24-3-34. Further, while Henderson's assertions of Robison's continued drug use and criminal activity after 1991 may have been based on hearsay, they were arguably admissible as evidence of her state of mind in contacting DFCS and eventually agreeing to consent to the adoption of her children. Her assertions were further supported by the contemporaneous letters she wrote to DFCS during her incarceration, as well as by Robison's subsequent incarceration in 1994. This court presumes that the trial court, unlike a jury, recognizes hearsay and will disregard such evidence if it appears incredible or unreliable. See, e.g., *Daniels v. State*, 211 Ga. App. 23 (438 SE2d 99) (1993). Since the evidence regarding Robison's criminal activities during Henderson's incarceration was relevant, was supported by additional evidence, and had independent indicia of reliability, there was no abuse of discretion by the trial court in admitting the statements.

Therefore, after considering the totality of the evidence in a light most favorable to the appellee, a rational factfinder would be justified in determining that Robison lacked "proper parental control" under OCGA § 15-11-81 (b) (4) (B) (ii)-(v); the same evidence supports an inference that Robison's past misconduct is likely to continue in the future. See *In the Interest of A. M. V.*, 222 Ga. App. at 531; *In the Interest of B. J.*, 220 Ga. App. at 146. Further, there is clear and convincing evidence to support a determination that the termination of Robison's parental rights is in the best interests of the children. *In the Interest of S. L. W.*, 221 Ga. App. at 513. We affirm the judgment of the trial court as to the termination of Robison's parental rights.

*Judgments affirmed. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 3, 1997.

*James E. Wilbanks*, for appellant (case no. A97A0131).
*Richard L. Yancey*, for appellant (case no. A97A0132).
*Michael J. Bowers*, Attorney General, *Shalen A. Sgrosso*, Assistant Attorney General, *Waycaster, Morris, Johnson & Dean*, *Cynthia N. Johnson*, *Jeffrey J. Dean*, for appellee.