A99A1550, A99A1551. IN THE INTEREST OF J. H., a child (two cases).
(523 SE2d 374)

ELDRIDGE, Judge.

Appellants individually challenge the sufficiency of the evidence in the December 1997 termination of their parental rights to their son, J. H. Their motions for new trial were denied by the Cobb County Juvenile Court, and they separately appeal. Because we find that the evidence supports the termination of their parental rights, we affirm.

The standard of review of a juvenile court's decision to terminate parental rights is as follows: "whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural

---

parent's rights to custody have been lost." (Citations and punctuation omitted.) *In the Interest of E. C.*, 225 Ga. App. 12, 13 (482 SE2d 522) (1997). See also *In the Interest of T. B. R.*, 224 Ga. App. 470, 472 (480 SE2d 901) (1997).

> Under OCGA § 15-11-81 (a), the considerations for terminating parental rights involve a two-step process. The trial court must first determine whether there is present clear and convincing evidence of parental misconduct or inability. Such conduct or inability [shall] be proved by showing, inter alia, that (1) the child is deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

(Citations and punctuation omitted.) *In the Interest of E. C.*, supra at 14. See also OCGA § 15-11-81 (a), (b) (4) (A) (i)-(iv).

In determining whether there is a lack of "proper parental care [and] control," the court may consider several factors, including the following:

> (i) [a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; (ii) [e]xcessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child; (iii) [c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship; (iv) [e]gregious conduct or evidence of past egregious conduct of the parent toward the child . . . of a physically, emotionally, or sexually cruel or abusive nature; [and] (v) [p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child . . . by the parent.

OCGA § 15-11-81 (b) (4) (B) (i)-(v). In addition to these factors, if the child is not in the custody of the parent whose rights are being terminated, the trial court shall consider whether the parent failed to make a bona fide attempt to communicate with the child; comply with court-ordered support of the child; or comply with a court-

ordered reunification plan for a period of at least one year prior to the termination proceeding. OCGA § 15-11-81 (b) (4) (C) (i)-(iii).

> Once the trial court establishes a lack of parental care and control, the second part of the test for determining whether parental rights should be terminated is whether such termination "is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home." OCGA § 15-11-81 (a).

*In the Interest of E. C.,* supra at 14.

### Case No. A99A1550

The evidence in this case was generated during several hearings in the fall of 1997. The transcripts of such hearings show that both appellants and at least 20 other witnesses appeared to testify[1] regarding the termination petitions. Viewed in favor of upholding the termination, the evidence in this case showed that J. H. was born on November 8, 1990, and is the only child of the appellants, who separated in 1992 and divorced in 1993. Following the separation, the child lived with his mother.

The evidence included numerous allegations of the mother's unrehabilitated drug abuse prior to and after the birth of J. H. She was convicted of possession of methamphetamine and marijuana in 1995. A semi-automatic handgun and $1,853 in cash found near the drugs were confiscated and forfeited pursuant to OCGA § 16-13-49 (o) (4).

Witnesses described the mother's demeanor as occasionally "bizarre," and her lifestyle was characterized as "chaotic," "nomadic" and "transient." She would sometimes leave J. H. with a babysitter or her father, then disappear for days or weeks without explanation.

Despite the father's long-term physical abuse of her and the child (see infra), she consistently exposed the child to such abuse. In 1992, the mother filed a family violence petition, alleging that the father abused her "over and over for 2 years."

---

[1] The Department of Family & Children Services ("DFCS") called the mother to the stand for the purpose of cross-examination. However, the mother refused to testify at trial and, instead, repeatedly invoked her Fifth Amendment right against self-incrimination. The trial court explained that her testimony was not admissible against her in any other criminal proceeding and that her refusal to answer the questions could be construed against her. See OCGA § 15-11-88. However, she consistently refused to answer questions regarding the State's allegations of her misconduct or inability as presented below.

In January 1996, the mother attempted to drive around police officers who had stopped vehicles at a traffic intersection. Police officers noticed a small child sitting in her lap without any seatbelt or other restraint. As officers attempted to talk to her, she abruptly accelerated the car, forcing an officer to move out of the way to avoid being hit. J. H. recounted this incident during counseling sessions. The mother subsequently was indicted for aggravated assault.

Three months later, in April 1996, the child was taken into custody by the Cobb County Department of Family & Children Services ("DFCS") after an employee of Sheraton Colony Square Hotel in Atlanta heard loud cries and suspicious noises coming from a hotel room. When the employee knocked on the door and received no response, he entered the room with a security pass key and discovered J. H., whose hands and feet were tied to the bed with telephone cords. The bonds were so tight that the child's extremities were blue. The child had a large bleeding wound on his forehead and initially appeared to be dead. His eyes were swollen shut due to the mother's placement of an unknown substance in them. The mother was hovering over the child in the hotel room and "was chanting to God and to Jesus . . . about the devil." The child told police officers that his mother had sucked blood from his wound in order to get the devil out of him.

The mother was arrested and charged with cruelty to children in Fulton County. In December 1996, a psychiatrist determined that she was not competent at the time to stand trial on the charge.[2]

J. H. was hospitalized after the hotel incident for treatment of his physical wounds and the traumatic stress he suffered. The child has been in foster care through DFCS since the incident. DFCS filed a petition to terminate the rights of both parents on August 13, 1996.[3]

Since the hotel incident, various child psychologists have evaluated J. H., his parents, and his extended family. Dr. Arden Dingle, a child psychiatrist with Grady Health Systems, testified at trial that she examined J. H. during his hospitalization following the hotel incident. Dr. Dingle reported that the child had experienced severe psychological trauma and that he suffered from an acute stress disorder as a result. Dr. Dingle also opined that children who had experienced this type of trauma need "consistent, safe care-takers who [provide]

---

[2] The record shows that, in November 1996, the trial court was informed that "the mother's mental condition has recently deteriorated"; she refused to speak, take medicine, or eat; and she had to receive emergency treatment after swallowing a spoon.

[3] DFCS previously had filed a deprivation action regarding this child. All parties agreed to consolidate the deprivation action with the termination petitions. In addition to DFCS' petition, the child's paternal grandfather also filed a termination petition, which was combined with this action.

adequate structure and supervision."

The child's primary treating psychologist, Dr. Elizabeth Moye, opined that J. H. was psychotic immediately following the hotel incident and suffered from "Post-Traumatic Stress Disorder" ("PTSD") as a result of the incident. Dr. Moye testified that the child was very afraid of his mother and believed that she attempted to kill him. He told the psychologist that he "want[ed] [his mother] to be put in jail on the other side of the ocean so that she will never find him." Dr. Moye noted that the child told her that he also believed his father had attempted to kill him when he was younger. Dr. Moye testified that she believed J. H. had been exposed to traumatic events prior to the hotel incident. J. H. reported to her that he had witnessed incidents involving violent acts, drugs, and guns and told her that he was afraid someone was going to hurt him. According to Dr. Moye's report, the foster mother told her that J. H. had several cigarette burns on his back that were caused by his mother's brother and one of her male friends. Dr. Moye noted that J. H. had exhibited numerous behavioral problems, including being "very distractable" and "sexually acting out," and that he experienced severe nightmares and sleep disorders. Since being placed in foster care and receiving psychological therapy, J. H. has thrived and has become attached to his foster family. However, Dr. Moye opined that he was still "very fragile" and "vulnerable" and needed protection from future retraumatization. She particularly noted that she had significant concerns about taking this "scared child" to a prison so that he could visit his father, since he "worries about the world being full of dangerous criminals who might try to hurt people."

The court-appointed psychologist, Dr. Harriet Elizabeth King, agreed that J. H. was "very fragile" and suffered from PTSD and extreme anxiety, as well as a "reactive attachment disorder." She also agreed that J. H. had grown up in a "grossly disturbed environment [with] a chaotic lifestyle," but had benefited greatly from the stability provided by the foster family. After considering the mother's long-term history of a "severe psychological . . . emotional disturbance," Dr. King opined that it would be "unrealistic" to expect the mother to be rehabilitated. Therefore, she recommended that the mother's parental rights be terminated.

Dr. Martin Youngleson, the Cobb County Jail Coordinator of Mental Health, came to a different conclusion regarding the mother's mental health. He testified that, when he first interviewed the mother in 1996, she was taking anti-psychotic medication and was depressed and "agitated." However, when he interviewed the mother on October 27, 1997, he found that she no longer exhibited symptoms of a thought disorder or psychosis and was legally competent. When asked whether the mother's history of severe mental illness pre-

cluded her from ever being a fit parent, Dr. Youngleson stated that, because "mental illness is separate from the parental skills[,]" if the parental skills were adequate before the onset of the mental illness, then they would be adequate after mental health treatment also. Accordingly, he recommended against termination of the mother's parental rights.

However, the value of Dr. Youngleson's recommendations to this proceeding was limited because they appeared to consider only the mother's mental health status and her best interests, not the best interest of the child. It is undisputed that he did not interview J. H. in order to assess his mental and emotional condition.

Following the presentation of evidence, the child's guardian ad litem recommended the termination of both parents' rights. After reviewing the totality of the evidence, the trial court agreed and ordered such termination.

On appeal, we have exhaustively reviewed the entire record and the trial court's comprehensive, fact-intensive order. The evidence supports the trial court's finding that the child is deprived and that such deprivation was caused, at least in part, by the mother's lack of proper parental care or control. See OCGA § 15-11-81 (b) (4) (A) (i), (ii); see also OCGA §§ 15-11-2 (8); 15-11-81 (b) (4) (B). The evidence shows that the mother is unable to care for the child due to her incarceration for performing egregious, violent acts against the child, which acts caused the child extreme emotional trauma and physical pain and which clearly had a "demonstrable negative effect on the quality of the parent-child relationship." OCGA § 15-11-81 (b) (4) (B) (iii), (iv). Prior to the climactic hotel incident, the mother exposed the child to an abusive, nomadic, and turbulent lifestyle filled with unrehabilitated drug use and violence. OCGA § 15-11-81 (b) (4) (B) (ii); *In the Interest of C. J. V.*, 236 Ga. App. 770, 776 (513 SE2d 513) (1999); *In the Interest of E. C.*, supra at 15-16. Finally, the mother suffered from a long history of mental illness, including a severe psychotic condition which led her to injure J. H. OCGA § 15-11-81 (b) (4) (B) (i).

The evidence also shows that the cause of the deprivation is likely to continue and that such deprivation will cause "serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-81 (b) (4) (A) (iii), (iv).

> In addition to evidence of present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation would be likely to continue. Such an inference is appropriate, since the juvenile court is not required to reunite [J. H.] with [his mother] in order to obtain current evidence of deprivation or neglect.

(Citations and punctuation omitted.) *In the Interest of A. C.*, 230 Ga. App. 395, 397 (496 SE2d 752) (1998).

In this case, the trial court found that, even if the mother's mental illness was successfully treated, the mother would be unable to parent J. H. if he was returned to her custody. This conclusion was based on the fact that, prior to the hotel incident, the mother

> routinely used drugs, even when pregnant, abandoned her child, spent time in jail on felony charges, consorted with felons and drug distributors, and lived a life that caused her child to become psychotic from the stress she caused him. There is no evidence to cause the court to believe that she will be any different when and if she is released from the custody of law enforcement or mental health officials.

Indeed, the record strongly supports a conclusion that the mother "is physically, emotionally, and financially unable to manage her own life, even without the added burden of a young, dependent child." *In the Interest of E. C.*, supra at 17.

As to whether the child will be harmed if the mother's rights are not terminated and he is eventually returned to her care, the psychologists agreed that the child remains very fragile, is in need of a secure, stable environment, and still fears that his mother will harm him. However, he has thrived while in foster care, overcoming many of the symptoms of the severe emotional trauma from his first six years.

Based upon this evidence, this Court is satisfied that there is sufficient clear and convincing evidence of parental misconduct or inability, as contemplated by OCGA § 15-11-81 (a) and (b) (4) (A).

As to the second prong under OCGA § 15-11-81 (a), "[t]hose same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest." (Citations and punctuation omitted.) *In the Interest of A. C.*, supra at 398.

> In cases of this type in which the parent is unable to care for the child due to some type of mental disability, the court must make the welfare of the [child] its paramount concern. In determining the best interest of the [child], the court may consider the [child's] need for a stable home environment and the detrimental effects of prolonged foster care.

(Citations omitted.) *In the Interest of C. D. C.*, 230 Ga. App. 237, 238 (495 SE2d 872) (1998). The evidence presented clearly demonstrates that termination of the mother's rights is in J. H.'s best interest. There was no error.

*Case No. A99A1551*

In his appeal, the father asserts that his parental rights were terminated solely because he murdered his child's maternal grandmother in 1992. This argument is without merit.

The record shows that the father has had several previous felony and misdemeanor convictions resulting from violations of the Georgia Controlled Substances Act, as well as a conviction for possession of a firearm by a convicted felon and five convictions for driving under the influence of alcohol. Although he participated in drug treatment in 1981-1982, such treatment apparently was unsuccessful. Prior to his incarceration in 1992, see infra, he had a long history of substance abuse, including alcoholism and abuse of cocaine, heroin, and "speed."

As noted above, substantial evidence was presented to demonstrate that the father physically abused both the mother and J. H. before and after the divorce. During the mother's pregnancy with J. H., the father pointed a loaded gun at her abdomen. Other family members also testified that the father repeatedly threatened to shoot them — and himself — with a handgun. In addition, there was evidence that the father had had abusive physical contact with the child, such as picking the child up by his extremities and shaking him.

The father's violent actions continued and culminated when, on December 16, 1992, he attempted to kill both the mother and two-year-old J. H. On that day, the father and mother had an argument on the telephone. The father went home and found the front door barricaded, so he went through the back door and confronted the mother, who was on the telephone. After jerking the telephone cord from the wall, the father retrieved a loaded handgun from a back room. As the mother and J. H. attempted to escape, the father repeatedly shot three television sets and a glass door. He then ran outside and shot toward the mother and J. H. as they ran into the woods. While they sought refuge in a neighbor's house, the father confronted and murdered his mother-in-law (the child's maternal grandmother) before shooting himself in the mouth.

The father was convicted of malice murder and felony murder in October 1994 and sentenced to life in prison. He admits that he will not be eligible for parole until 2007 at the earliest, at which time J. H. already will be 17 years old.

At the time of the murder, the father was the sole stockholder in a chain of retail stores called Starship Enterprises of Atlanta, Inc. ("Starship Enterprises"). The stores specialized in adult sexual novelties, sexually explicit "triple X" movies, and drug paraphernalia. Following the murder, the father created an irrevocable trust for the

maintenance, support, and education of J. H. and transferred his stock from Starship Enterprises into the trust. The apparent intention of this transfer was to shield these assets from the mother and from potential civil lawsuits against the father resulting from his murder of J. H.'s maternal grandmother.

Since the trust was created, the value of the business has increased from $177,000 to over $2 million, with a liquidation value of $5 million. However, the actual value of the trust corpus is in dispute.

According to the trial court, the father appointed "figurehead trustees" to oversee the trust, so that he could maintain control over the trust. Until October 24, 1997, Charles Graham, former president of Starship Enterprises, acted as the trust's trustee. At the same time, Graham held a general power of attorney over the father's personal affairs. Prior to serving as trustee, Graham had numerous felony drug convictions and was, according to the trial court, "a notorious drug offender." Immediately prior to the termination hearings, he pled guilty to and was incarcerated on cocaine trafficking charges.[4]

With his friend and associate Charles Graham as trustee, the father had extensive access to the trust corpus. Until the December 1997 termination of his parental rights, the father continued to draw a "consulting fee" of between $45,000 and $50,000 a year from the business and accumulated additional assets with a value exceeding $140,000. However, he failed to pay any child support during 1996 or 1997. Although the father insists on appeal that he has given the child many "gifts" since being incarcerated, the evidence demonstrates that such gifts actually were paid for with funds from the child's own trust. The evidence also indicated that trust assets may have been used to purchase cars, homes, clothing, furniture, and other gifts for a number of people, including the father's children from a previous marriage. Further, a Destin, Florida condominium was purchased as an "investment" by the trust, although it apparently was used primarily by Graham.

The father also used trust funds to pay approximately $120,000 in his own legal expenses related to the termination case. In addition, he authorized the trustee to spend several thousand dollars in attorney fees on behalf of family members and friends who sought to intervene in this action so that they could obtain custody of J. H. if the parents' rights were terminated. It is undisputed that none of the attorney fees for either J. H. or his mother were paid from the trust fund.

---

[4] After he was incarcerated, Charles Graham named Tom Mullins as the successor trustee to oversee the trust with the father's approval. Tom Mullins is on the Board of Directors of Starship Enterprises.

However, Graham and the father attempted to justify these expenditures by asserting that termination of the father's rights was not in J. H.'s best interest, so that the use of trust funds to challenge the termination fell within the purpose of the trust. In support of this position, the father relied in part on the opinion of Dr. King, the court-appointed psychologist. Dr. King initially recommended against termination of the father's rights. However, Dr. King's testimony and recommendations were based upon her determination that various negative allegations against the father were "unsubstantiated." On cross-examination, Dr. King admitted that, at the time she wrote her report to the trial court, she either was not aware or had not investigated allegations of the father's history of alcohol or drug abuse, his threatening acts toward J. H. or the mother, or his numerous criminal drug and DUI convictions. She testified that she received much of her information about the father from files and depositions supplied by his attorney. Dr. King testified that, if the allegations had been substantiated, she would have been more concerned about the father's "inability not to harm his child." Notably, once the trial court terminated the parents' rights, Dr. King modified her recommendation by suggesting that the trial court should prohibit any further contact with the child by either parent. Accordingly, the father's reliance upon Dr. King's initial recommendation is misplaced.

After reviewing the entire record and hearing transcripts as to the father's case, this Court finds that there is sufficient evidence to support each of the statutory requirements for terminating his parental rights under OCGA § 15-11-81.

As noted above, the child is presently deprived. OCGA §§ 15-11-2 (8); 15-11-81 (b) (4) (A) (i). This deprivation is caused in part by the father's lack of proper care and control, which is most clearly demonstrated by his incarceration for the felony murder of J. H.'s grandmother. OCGA § 15-11-81 (b) (4) (B) (iii). Such murder deprived J. H. of the companionship of *both* the grandmother and the father, thereby causing the child extreme emotional trauma and creating a "demonstrable negative effect on the quality of the parent-child relationship." Id. While the father is correct in asserting that imprisonment alone does not compel a termination of parental rights, such imprisonment

> will support such a ruling when adequate aggravating circumstances are shown to exist. These aggravating circumstances may include a criminal history of repetitive incarcerations for the commission of criminal offenses or parole violations, which constitutes an additional factor which may be considered in determining whether the child *presently* is

without the proper parental care and control of the offending parent, and that such is likely to continue.

(Citations and punctuation omitted; emphasis in original.) *In the Interest of T. B. R.*, supra at 473. See also *In the Interest of C. J. V.*, supra at 775. In this case, the father had numerous convictions for drug-related offenses, DUI, and weapons charges. Further, there was substantial evidence of long-term physical abuse of the child's mother and violent threats toward J. H. and other family members.

In addition, although the father claims that he has not abused drugs and has become "rehabilitated" since his imprisonment, such assertion carries little probative value and was rejected by the trial court. In its final order, the trial court found that, although the father had participated in various treatment and educational programs during his imprisonment,

> [h]is previous efforts at drug rehabilitation have failed, . . . and he has had no access to drugs in prison. His rehabilitation is unproved. . . . [T]he Court finds he has demonstrated a history of chronic unrehabilitated abuse of narcotic drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his child. See OCGA § 15-11-81 (b) (4) (B) (ii).

While the father's efforts to improve himself during his imprisonment are commendable, "the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citations and punctuation omitted.) *In the Interest of T. B. R.*, supra at 475. "The decision as to the [child's] future must rest on more than positive promises which are contrary to negative past fact." (Citations and punctuation omitted.) *In the Interest of A. H.*, 226 Ga. App. 279, 284 (486 SE2d 412) (1997).

Further, although the father asserts that he has sent the child numerous cards and gifts since his incarceration,[5] such recent efforts to nurture this child, like the father's efforts at self-improvement, fall short of negating years of exposing the child to drug abuse, drug trafficking, alcoholism, violence, and suicide attempts, as well as the instability resulting from his mother's mental illness. *In the Interest of T. B. R.*, supra. All of these problems are directly attributable to the father's pre-confinement lifestyle and to the fact that the father has been unavailable to care for the child due to his current incarceration.

---

[5] See OCGA § 15-11-81 (b) (4) (C) (i).

In addition, such efforts do not alter the fact that the father is *presently* depriving his child of the full benefit of his irrevocable trust. As to the father's claim on appeal that he has provided financially for the child by creating the trust, the trial court found that,

> [w]hile the creation of the trust may be seen as an act of generosity by the donor [father], it may also be seen as sinister manipulation of resources, protecting them from victims who may have a compelling claim on them, while still allowing the donor to retain complete control of, and benefit from, them.

After hearing the evidence at trial, the trial court found the latter to be true.[6] The trial court also found that the fact "that more than a hundred thousand dollars of the child's estate may have been wasted could be considered as evidence of *current* child deprivation" by the father. (Emphasis supplied.) This is in addition to the fact that the father has failed to pay any child support since 1996, even though he earned approximately $50,000 annually while imprisoned. See OCGA § 15-11-81 (b) (4) (C) (ii).

It also would be reasonable to infer from this evidence that, if the father's rights are not terminated, he will continue to draw from the child's trust as long as possible, perhaps until it is depleted. This indicates that such deprivation is likely to continue in the future. OCGA § 15-11-81 (b) (4) (A) (iii).

There is little doubt that such continued deprivation will cause J. H. serious harm. The father is serving a life sentence and has admitted that he will not be eligible for parole until 2007 at the earliest. If the father's rights are not terminated, J. H. will be committed to spending his entire childhood in temporary care, in the *hope* that his father will be released from prison and will be able and willing to care for him. *In the Interest of T. B. R.*, supra at 477. For a vulnerable child who desperately needs and desires stability, such arrangement is unacceptable. See *In the Interest of R. N.*, 224 Ga. App. 202, 205 (480 SE2d 243) (1997).

Accordingly, we find that the trial court's finding of parental misconduct or inability on the part of the father was supported by clear and convincing evidence. This same evidence also supports the trial court's finding that termination of the father's parental rights was in the child's best interest. *In the Interest of C. J. V.*, supra at 778; *In the Interest of A. C.*, supra at 398. There was no error.

---

[6] Following the termination of the father's parental rights, the trial court named the child's guardian ad litem as guardian over the child's property, including the trust, and ordered an accounting of the trust's assets.

*Judgments affirmed. Pope, P. J., and Smith, J., concur.*

DECIDED OCTOBER 7, 1999.

*James K. Knight, Jr.,* for appellant (case no. A99A1550).
*J. Stephen Clifford,* for appellant (case no. A99A1551).
*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Sanders B. Deen,* for appellee.