536 S.E.2d 225 (2000)
244 Ga. App. 553
In the Interest of D.P., a child (Two Cases).
Nos. A00A0842, A00A0843.
Court of Appeals of Georgia.
June 22, 2000.
*226 William S. Hart, Bobby G. Adkins, Jr., Marietta, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, Sanders B. Deen, Marietta, for appellee.
RUFFIN, Judge.
The juvenile court terminated the parental rights of D.P.'s mother, C.P.,[1] and she appeals on several grounds.[2] Because her arguments lack merit, we affirm.
The law applicable to the termination of parental rights is well established:
The trial court must first determine whether there is present clear and convincing evidence of parental misconduct or inability. Such conduct or inability shall be proved by showing ... that (1) the child is deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.... Once the trial court establishes a lack of parental care and control, the second part of the test for determining whether parental rights should be terminated is whether such termination is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.[3] *227 We review the evidence in the light most favorable to the juvenile court's decision, and we will affirm that decision if any rational trier of fact could have found by clear and convincing evidence that the above standard was met.[4]
The record shows that D.P. was born on April 5, 1998. His mother, C.P., was 15 years old at the time. C.P. had been in and out of the custody of the Department of Family & Children Services (DFCS) since she was 12, when her mother beat her with a bed slat. After C.P. ran away from several foster homes, committed the offense of "rude and opprobrious language," and was suspended multiple times from middle school, the juvenile court adjudicated her as a delinquent and sentenced her to ninety days in "boot camp," followed by two years of probation. After her release from "boot camp" in January 1997, C.P. was returned to her mother's custody.
In September 1997, C.P. learned that she was pregnant.[5] Her mother told her that she could not live at home if she was going to keep the baby, so C.P. called her probation officer, who made DFCS aware of the situation. DFCS placed C.P. in a foster home in Mableton, but she ran away after one month. On October 31, 1997, C.P. was committed to the custody of the Department of Juvenile Justice, and she stayed in the Marietta Youth Detention Center until February 10, 1998. She was then placed at Families First, a group home in Atlanta for pregnant young women.
After D.P. was born, C.P. was placed in Ms. Jackson's group home in Atlanta. Although C.P. testified that she was not supposed to have a baby in the group home, her Juvenile Justice caseworker testified that a waiver of certain state regulations had been obtained so that D.P. could stay at the group home with his mother. On May 30, 1998, C.P. left Jackson's group home without permission and failed to attend classes. C.P. was apprehended on June 1 and sent back to the Marietta Youth Detention Center. D.P. was placed with C.P.'s mother. Following a hearing on June 4, the juvenile court determined that C.P. had violated the conditions of her placement. She was sent to boot camp in Emanuel County from June 16 to July 30.
After her release from boot camp, C.P. was supposed to return to her mother's apartment. However, her mother refused to take C.P. in and got into a violent altercation with the Juvenile Justice worker who had brought C.P. to her residence. At the time of D.P.'s termination hearing, criminal charges related to this incident were pending against C.P.'s mother. Because C.P. had nowhere else to go, she called Jackson's group home and asked if she could return. Jackson apparently agreed, and C.P. and D.P. returned to the group home on July 30.
C.P. ran away from Jackson's group home a second time on August 12. She told her DFCS caseworker that she had left D.P. with a friend in Swainsboro. D.P. was brought into the custody of DFCS. On August 17, DFCS filed a petition seeking a judicial determination that D.P. was deprived and a termination of C.P.'s parental rights. Following a hearing that same day, the juvenile court issued an order finding that D.P. was deprived because his mother's whereabouts were unknown and his father's identity and whereabouts were unknown. There is nothing in the record to indicate that C.P. ever appealed this order.
C.P. was apprehended on September 6 and sent to the Marietta Youth Detention Center. She stayed there until September 16, when she was placed temporarily at Alternate Life Paths, a group home in Atlanta. On September 25, she was placed at a group home in Claxton, and she stayed there until October 19, when she ran away. C.P. was missing until December 2, when she turned herself in to Atlanta Police, who took her back to the Marietta Youth Detention Center. She stayed there until December 9, when she was placed in another group home. After two *228 days, the home asked that C.P. be removed because she was being disruptive. On December 11, C.P. was taken to her mother's apartment and placed on an electronic tracking device.
On January 12, 1999, C.P. pled guilty in Cobb County Juvenile Court to charges of theft by taking and was ordered to pay restitution. She was recommitted to the Department of Juvenile Justice and released into the custody of her mother.
On January 20, police were called to C.P.'s mother's apartment. According to C.P., her mother had kicked her out of the apartment and would not let her return. Although C.P. and her mother both downplayed the incident, C.P.'s mother was arrested and charged with cruelty to children after she apparently grabbed a plate of food out of C.P.'s hands and shoved C.P. against a wall in the presence of a police officer. After her mother's arrest, C.P. stayed with a neighbor for a few days. On January 26, she was recommitted to the custody of the Department of Juvenile Justice and sent to the Macon Youth Detention Center, where she was scheduled to remain in detention for seven to ten months.[6]
C.P.'s Juvenile Justice caseworker testified that C.P. has been placed in more homes and shelters than anyone else on her caseload and that C.P.'s only current option is a youth detention center because "she has been to several group homes and we cannot keep her at those group homes." C.P.'s DFCS caseworker testified that:
[C.P.] went through many placements, including our shelters, which would never accept her back after some incidents.... [A]ll of the [foster homes] that we have been able to place her at previously, they would never take her back. She's been in different shelters in different counties, and she lost those placements. Several placements wouldn't even accept her. Once we make a contact with a resource for a placement, we are obligated to give them history on the youth that we're speaking of; and she was turned down in several foster homes and several shelters and several group homes even from making application.
Psychological tests indicate that C.P. needs individual therapy. The State has offered her that service, but she has not remained in any placement long enough to take advantage of it.
Four months after D.P.'s birth, DFCS filed a petition to terminate C.P.'s parental rights. DFCS never developed a case plan to reunite D.P. with his mother. According to the DFCS caseworker, given the history of C.P. and her mother, DFCS felt it was "not in a position where we could place a young child in that environment and assume the child would be safe for a long period of time." The caseworker testified that social workers assigned to work with C.P. and her mother were met with resistance and concluded that "there was an imminent threat of violence between the mother and the daughter which was not likely to be reduced in the short term."
D.P. apparently has remained in DFCS' custody since August 1999. The caseworker testified that at first DFCS suspected he was a drug-addicted baby because "[h]e cried a lot and moaned a lot; the only time he was soothed was when he was held." D.P.'s pediatrician, however, attributed this behavior to the numerous disruptions, lack of a consistent caregiver, and lack of nurturing in his early life. D.P. is now healthy and reaching developmental milestones normally. The caseworker testified that DFCS wants to find a permanent adoptive home for D.P.
Following a hearing, the juvenile court entered an order terminating C.P.'s parental rights.
1. In her first enumeration, C.P. asserts that there was no evidence that *229 D.P.'s deprivation was attributable to her.[7] We do not agree.
The juvenile court found that C.P. was not mature enough to care for D.P. and had effectively abandoned him, and the record amply supports this finding. C.P.'s Juvenile Justice caseworker testified that the Department of Juvenile Justice placed C.P. in a group home and secured a waiver so that D.P. could remain with her, but she sabotaged this arrangement by skipping classes and running away from the home twice.[8] D.P. was taken into the custody of DFCS while C.P. was on the run and her whereabouts were unknown. At the time of the hearing, she had exhausted all possible placements except the detention center due to her history of running away and being disruptive. Thus, the record belies C.P.'s assertion that she is not responsible for D.P.'s deprivation. Accordingly, the trial court did not err in concluding that C.P.'s misconduct was the cause of her son's deprivation.
2. Next, C.P. contends that there was no evidence that D.P.'s deprivation would likely continue or not be remedied if he were returned to C.P.'s custody. According to C.P., the evidence at the hearing addressed only C.P.'s past behavior, not her current or future behavior. Again, we disagree.
We have repeatedly held that "the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue."[9] C.P. had an extensive history with DFCS and the Department of Juvenile Justice.[10] She had a history of fighting and criminal behavior, and she and her mother had resisted the efforts of DFCS' social service workers to help them. She had been to boot camp twice, and she had disrupted and run away from foster home and group home placements so many times that the only placement available to her was the youth detention center, where her son was not allowed. As the juvenile court wrote, "[t]he downward decline of the minor mother's behavior as seen through her history with this court indicates a strong likelihood that she will not be able to appropriately provide for the subject child's future development and necessities."
Although C.P. testified at the hearing that she is working toward her GED and wants to find employment so that she can provide for her son, "judging the credibility of her good intentions was a task for the juvenile court."[11] As we have repeatedly held, "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[12] The juvenile court did not err in determining that D.P.'s deprivation would likely continue or not be remedied if he were returned to C.P.'s custody.
3. Finally, C.P. assertswith no elaborationthat the State failed to establish that termination of her parental rights was in D.P.'s best interest. However, the evidence showed that D.P. initially had behavioral problems as a result of the repeated disruptions, lack of a consistent caregiver, and lack of nurturing in his early life. The DFCS caseworker testified that termination of C.P.'s parental rights would give him the opportunity for adoption and a permanent home. Thus, the juvenile court was authorized *230 to conclude that such termination was in D.P.'s best interest.[13]
Judgment affirmed.
ANDREWS, P.J., and ELLINGTON, J., concur.
NOTES
[1] The juvenile court also terminated the parental rights of D.P.'s putative father, who did not respond to the termination petition, did not attend the termination hearing, and apparently has not appealed the juvenile court's order.
[2] Because two different attorneys representing C.P. filed notices of appeal, the case was assigned two different numbers in this Court. In reality, Case Nos. A00A0842 and A00A0843 are the same case, and we will treat them as such.
[3] (Citations and punctuation omitted.) In the Interest of J.H., 240 Ga.App. 309, 310-311, 523 S.E.2d 374 (1999).
[4] Id. at 309-310, 523 S.E.2d 374.
[5] C.P. initially refused to reveal the identity of D.P.'s father because she feared he would be prosecuted for statutory rape.
[6] Juveniles housed at youth detention centers are not allowed to have children of their own inside the facility.
[7] As C.P. does not challenge the juvenile court's finding that D.P. is deprived, she is bound by that finding. See In the Interest of A.M.B., 219 Ga. App. 133, 134, 464 S.E.2d 253 (1995) (unappealed decision in deprivation hearing is binding on appeal).
[8] Although C.P. claims that she was not allowed to keep D.P. at the group home, the juvenile court was entitled to credit the testimony of D.P.'s caseworker that special arrangements had been made for D.P. to stay with C.P. See, e.g., In the Interest of J.O.L., 235 Ga.App. 856, 510 S.E.2d 613 (1998) (on appeal from a termination of parental rights, this Court "neither weighs evidence nor determines the credibility of witnesses") (punctuation omitted).
[9] (Punctuation omitted.) In the Interest of A.M.B., supra.
[10] See id. (in determining that deprivation was likely to continue, the court noted that DFCS had worked unsuccessfully with the family for many years).
[11] In the Interest of R.N., 224 Ga.App. 202, 205(2), 480 S.E.2d 243 (1997).
[12] (Punctuation omitted.) Id.
[13] See id. (court "properly concerned itself with the need for stability" in the lives of the children, who "had been bounced between foster homes and their parents' home over the previous several years, to the detriment of their emotional stability").