546 S.E.2d 319 (2001)
248 Ga. App. 213
In the Interest of A.L.E. et al., children.
No. A01A0205.
Court of Appeals of Georgia.
February 22, 2001.
*320 Joseph T. Justice, Marietta, Scott P. Semrau, Douglasville, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Sanders B. Deen, Marietta, for appellee.
MIKELL, Judge.
The life of this mentally ill appellant unraveled after her husband was struck down by a massive stroke. Despite this tragic circumstance, we reluctantly affirm the termination of her parental rights. However, we remand for a hearing on appellant's ineffective assistance of counsel claim.
This court has long recognized that termination of parental rights is a severe measure. There is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. When we do this, we make a decision on human frailties and their consequences. It becomes an agonizing undertaking.[1]
*321 An appellate court must affirm a termination order if a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[2] We do not weigh the evidence or determine witness credibility but defer to the juvenile court's factfinding.[3] Moreover, we review the evidence in the light most favorable to the state.[4]
So viewed, the evidence in the instant case shows that appellant suffered her first psychotic break in 1990 when she was 27 years old. Since then she has been hospitalized in psychiatric institutions at least eight times. Appellant and her husband were married in 1992, and T.S.E. was born on October 24, 1992. During appellant's pregnancy with A.L.E., who was born on May 30, 1998, her physician became concerned about her behavior and contacted the Cobb County Department of Family & Children Services ("DFACS"). Appellant's husband signed a safety plan, promising to provide supervision for appellant while she was caring for the children; however, appellant failed to take her medication and was left at home alone with the children. DFACS then provided intensive in-home assistance, which significantly improved appellant's home life until March 18, 1999, when appellant's husband suffered a massive stroke which left him totally paralyzed, save for the ability to blink his eyes. He became comatose and died on February 10, 2000.
Appellant's mental condition quickly deteriorated after her husband's stroke. On April 1, 1999, appellant left her children alone in the car in the hospital's parking lot while she visited her husband. Hospital security called the police, and appellant was arrested and charged with two counts of deprivation. On May 3, when appellant arrived at the hospital with her children, she was intoxicated and tried to give her husband beer.
On May 14, 1999, the juvenile court entered an order finding the children deprived. The order, which was not appealed, reflects that appellant had not seen her treating psychiatrist, Dr. Klopper, for several months. The court ordered appellant to keep monthly appointments with Dr. Klopper, take her medication, and undergo counseling as recommended by Dr. Klopper. DFACS was awarded temporary custody of the children.
On June 5, appellant was arrested on a charge of reckless conduct after she checked her husband out of the hospital, against medical advice, to celebrate her birthday. Ten days later, the juvenile court held a review hearing and ordered appellant to attend supervised visitation with her children, to refrain from calling the children's foster home, and to see the same psychiatrist on a regular basis.
Appellant was arrested for DUI on July 14, 1999. Shortly thereafter, she was arrested for theft by taking cigarettes and candy from a convenience store. At a hearing on August 24, the court suspended appellant's visitation with her children. On September 7, 1999, the juvenile court found that appellant had failed to comply with portions of the court's previous order, although apparently she attended supervised visits with her children.[5]
On September 24, 1999, DFACS filed a petition to terminate parental rights, citing "aggravated circumstances that do not require the use of reasonable efforts to reunify the children with the parents."
On October 7, 1999, appellant pleaded guilty to two counts of deprivation, reckless conduct, theft by taking, and DUI. She was credited for time served and placed on almost four years probation. As a condition of probation, appellant was required to undergo psychiatric evaluation as well as treatment for alcohol dependency. On January 27, 2000, appellant's probation was revoked for *322 falsely reporting a crime and failing to participate in an alcohol treatment program. She was incarcerated when her husband died on February 10 and was transported from jail to attend the termination hearing on March 10, 2000.
The state called no witnesses at the hearing, relying instead on the deprivation orders, psychological evaluations, medical records from appellant's psychiatric hospitalization in December 1999, and her criminal history, all of which were stipulated into evidence.
John T. Cooper, Ph.D., a clinical psychologist, testified on appellant's behalf that it was premature to terminate her parental rights. Dr. Cooper explained that appellant suffers from schizoaffective disorder, which causes paranoia, delusions, hallucinations, and depression. However, Dr. Cooper testified, appellant had been misdiagnosed until September 1999 with bipolar disorder, and the correct diagnosis had not been explained to her. Therefore, he testified, she could not be blamed for refusing to take the wrong medication or to continue psychiatric treatment. Dr. Cooper described appellant as an "involved mother in tune with her children's needs and wants." He testified that with a proper education as to her diagnosis, as well as medication, therapy, and an alcohol abuse program, appellant could ultimately successfully parent her children. However, he admitted that it would take at least a year before appellant could resume custody.
Dr. Amy Holland, a psychiatrist, submitted a report concurring with Dr. Cooper's findings. Dr. Holland concluded that appellant could be reunited with her children "if close supervision is in place and if she remains in ongoing psychiatric care." However, we observe that Dr. Holland noted that in 1990, appellant had been diagnosed with schizophrenia and prescribed Trilafon, a medication she currently takes.
It does not appear that Dr. Cooper reviewed any of the medical records from appellant's eight psychiatric hospitalizations. On the other hand, Dr. Jeffrey Pipe, a psychiatrist, reviewed the records of her month-long hospital stay in 1998. In a report dated September 1999, Dr. Pipe diagnosed appellant with schizoaffective disorder and stated that the illness caused disordered thinking, paranoid delusions, and manic/depressive episodes. Dr. Pipe explained that appellant "is vulnerable to paranoid ideation which escalates into delusional thinking" followed by "manic episode[s] during which she ... becomes increasingly agitated and aggressive." Dr. Pipe concluded that these episodes, which can last from "six months to years," are likely to continue, and "during such episodes she is likely to compromise the welfare of her children...." Finally, he stated: "In the unlikely event that [appellant's] attitude [toward] her illness should change, strict compliance with a regimen of [medication] and individual therapy would ... significantly improve her functioning."
In December 1999, two months after Dr. Pipe's evaluation, appellant was admitted to Georgia Regional Hospital due to her "delusional, paranoid, agitated and abusive behavior." She also reported auditory hallucinations and that everyone was "out to get her, the Mafia is against her, and Freddie Kreuger is one of her family members." Appellant was diagnosed as "Bipolar ... manic with psychotic features."
Dr. Sheri Siegel conducted a court-ordered evaluation on February 6, 2000. Dr. Siegel reported that during the interview, appellant's "statements made little sense"; that testing revealed "serious psychological maladjustment" as well as difficulty managing routine daily affairs; that appellant's intensive periods of depression and psychosis would "predominate throughout her life"; and that her resistance to fully acknowledging and treating her mental problems "would seriously compromise her ability to appropriately parent her children." Dr. Siegel recommended termination of appellant's parental rights.
Appellant testified and was subjected to lengthy cross-examination. After the evidence was presented, the children's guardian ad litem recommended the termination of parental rights. After reviewing the evidence, the trial court agreed and ordered the termination.
*323 1. The statutory criteria for the termination of parental rights are the two-step procedure provided in OCGA § 15-11-94(a).[6] The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[7] If these four factors are satisfied, the court must then determine whether termination of parental rights is in the children's best interests, considering their physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.[8]
First, the unappealed deprivation orders of the juvenile court demonstrate that the children were deprived.[9] Second, in determining whether lack of proper parental care and control caused the deprivation, the juvenile court was authorized to consider several factors, two of which apply here: (i) "A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child,"[10] and (ii) "[e]xcessive use of or history of chronic unrehabilitated abuse of intoxicating liquors ... with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child."[11]
As recounted above, the testimony of appellant's own expert witness, coupled with medical reports admitted without objection, sufficed to establish her medically verifiable deficiency.[12] Appellant's own disjointed testimony further evidenced the ravaging effects of her mental illness. Appellant had difficulty focusing on her attorney's questions during direct examination. On cross-examination, she testified that one of her previous employers had been involved with the Mafia and was after her sexually; that she has started hearing voices since her children were removed from her custody; that sheriffs came to her house and stole her husband's wallet and checkbook; and that a nurse at the hospital assaulted her. "`A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination.'"[13]
Next, we consider whether the evidence of appellant's chronic unrehabilitated alcohol abuse rendered her incapable of parenting her children. Appellant testified that the pain of physical separation from her children caused her to "self-medicate" with alcohol. She said she drank herself to sleep every night after the children were taken away from her. Hospital records indicate that appellant reported abusing alcohol since age 18. Most significantly, appellant blamed DFACS, and not her illness, for the criminal charges against her:
A: I would never have had a DUI if my children were home and in bed sleeping that night and I wasn't deciding to get up and go see my husband at 2:30 in the morning at the rehab center. It was only a .08, which is not drunk in anybody's eyes except for a Breathalyzer's, so I blame them [DFACS] for that.
Q: And is it still your testimony today, after having admitted to Dr. Cooper [to] being drunk ... on approximately a hundred occasions, plus having a DUI just last summer, that you're not an alcoholic[?]
*324 A: Yeah.
Finally, appellant testified that she preferred to remain in confinement rather than be released on probation. A condition of appellant's probation is treatment for alcohol abuse. Moreover, the children were removed from her custody after she arrived with them at the hospital while in an intoxicated state.
Accordingly, we find the evidence that the children were without proper parental care and control clear and convincing.[14] We also find the state proved by clear and convincing evidence that the causes of the children's deprivation were likely to continue.[15] "`Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue.'"[16] Here, appellant testified that she would continue to take her medication as long as she could get it. She claimed that DFACS had dropped her from Medicaid over the summer, precluding her from taking her medication for a time. Dr. Cooper also expressed concern that appellant would stop taking her medication when she feels better, as she has in the past.
Additionally, the evidence shows that appellant will be unable to provide the necessities of life for her children after her release from jail. While confined, appellant's home was foreclosed upon, her cars were repossessed, and she lost her job. No family member appeared on her behalf at the hearing, and apparently no one is available to provide support for appellant after her release. "Indeed, the record strongly supports a conclusion that the mother `is physically, emotionally, and financially unable to manage her own life, even without the added burden of ... young, dependent child[ren].'"[17]
Finally, although appellant does not argue this issue, our review of the evidence compels us to affirm the juvenile court's conclusion that such deprivation will cause the children "serious physical, mental, emotional, or moral harm...."[18] Dr. Cooper testified that appellant has "no stress management skills whatsoever" and that in stressful situations she may not be able to appropriately parent her children. The juvenile court did not err.
2. Next we consider whether the state sustained its burden of proving by clear and convincing evidence that termination of appellant's parental rights is in the children's best interests. The state offered no evidence to indicate how the children were faring in foster care. However, the guardian ad litem represented to the court that he had continuing contact with the children and their foster mother, and he believed that termination was in the children's best interests.
We are constrained to adhere to the longstanding rule that the same factors that show parental misconduct or inability can support a finding that termination of parental rights is in the children's best interests.[19] "`[T]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.'"[20] Sadly, appellant's history of noncompliance with medication and treatment belies her promises of future compliance. Therefore, we conclude that the juvenile court's determination that termination was in the best interests of the children was supported by the evidence.[21]
3. Finally, appellant claims that her trial counsel rendered ineffective assistance. *325 As appellate counsel was appointed after trial counsel filed the notice of appeal in this case, the ineffectiveness claim has been raised at the earliest practicable moment.[22] In regard to the claim, appellant raises numerous issues that cannot be resolved under the present record. Therefore, we remand this case to the juvenile court for a hearing on appellant's claim of ineffective assistance of trial counsel.[23]
Judgment affirmed and remanded.
BLACKBURN, C.J., and POPE, P.J., concur.
NOTES
[1] (Citations and punctuation omitted.) In the Interest of J.A.B., 189 Ga.App. 79, 374 S.E.2d 839 (1988).
[2] In the Interest of A.C., 230 Ga.App. 395, 396(1), 496 S.E.2d 752 (1998).
[3] In the Interest of L.H., 236 Ga.App. 132, 133(1), 511 S.E.2d 253 (1999).
[4] Id.
[5] Appellant did not attend this hearing. It appears that she was in jail at the time, although the juvenile court was not aware of her incarceration.
[6] The procedure was previously codified at OCGA § 15-11-81(a).
[7] OCGA § 15-11-94(a), (b)(4)(A)(i)-(iv).
[8] OCGA § 15-11-94(a); In the Interest of D.B., 242 Ga.App. 763, 764, 531 S.E.2d 172 (2000); In the Interest of A.M.V., 222 Ga.App. 528, 529, 474 S.E.2d 723 (1996).
[9] In the Interest of B.L.S., 239 Ga.App. 771, 774, 521 S.E.2d 906 (1999).
[10] OCGA § 15-11-94(b)(4)(B)(i).
[11] OCGA § 15-11-94(b)(4)(B)(ii)
[12] See, e.g., In the Interest of J.W.H., 245 Ga. App. 468, 538 S.E.2d 112 (2000).
[13] (Citations omitted.) In the Interest of L.H., supra, 236 Ga.App. at 135(1), 511 S.E.2d 253.
[14] In the Interest of S.C.M.H., 238 Ga.App. 159, 517 S.E.2d 598 (1999).
[15] See OCGA § 15-11-94(b)(4)(A)(iii).
[16] In the Interest of R.N., 224 Ga.App. 202, 204(1)(c), 480 S.E.2d 243 (1997).
[17] (Citation omitted.) In the Interest of J.H., 240 Ga.App. 309, 315, 523 S.E.2d 374 (1999).
[18] OCGA § 15-11-94(b)(4)(A)(iv); In the Interest of S.C.M.H., supra.
[19] In the Interest of V.M.T., 243 Ga.App. 732, 736-737, 534 S.E.2d 452 (2000).
[20] In the Interest of D.I.W., 215 Ga.App. 644, 646(1), 451 S.E.2d 804 (1994).
[21] See In the Interest of J.B.A., 232 Ga.App. 345, 350, 501 S.E.2d 862 (1998).
[22] Glover v. State, 266 Ga. 183, 184(2), 465 S.E.2d 659 (1996).
[23] Corbin v. State, 240 Ga.App. 788, 791(4), 525 S.E.2d 365 (1999).