560 S.E.2d 725 (2002)
253 Ga. App. 798
In the Interest of J.V. et al., children.
No. A01A1629.
Court of Appeals of Georgia.
February 19, 2002.
*726 Cassandra M. Ford, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Thomas J. O'Donnell, Milledgeville, for appellee.
JOHNSON, Presiding Judge.
The mother of J.V. and J.S. appeals from the juvenile court's order terminating her parental rights. She contends the evidence does not support the juvenile court's finding that the deprivation is likely to continue or that termination is in the best interests of the children. We disagree and affirm the decision of the juvenile court.
The record shows that the Baldwin County Department of Family & Children Services (the Department) became involved with the family in July 1997 after receiving a report that the mother's boyfriend was physically abusing the boys, who were then seven and two years old, and also abusing her. A case manager visited the home and found trash and hazardous debris scattered about. A safety plan was put into place, and the mother, then 24 years old, agreed to keep the home clean and free from safety hazards, ensure that her boyfriend had no contact with the children, and schedule a counseling appointment at the Rape Crisis Center.
While the safety plan was in effect, and while the children were still in the mother's custody, the Department assisted the mother financially by paying her rent in August 1997, and by paying her rent and utilities and buying her groceries in June, July, and August 1998.
In December 1998, the Department received a report that the children were afraid of the mother's boyfriend, that they were being left unsupervised in the neighborhood, and that they were going from house to *727 house looking for food. The mother signed another safety plan in January 1999, promising not to allow the children to have any contact with her boyfriend and not to allow the boyfriend into her home and agreeing to supervise the children or secure appropriate day care arrangements for them.
In March 1999, the Department received reports that the mother was allowing the boyfriend to stay in the home and that he hit J.V. in the back with a coat hanger. The case manager visited the home and found that the mother was at work and that the children were not supervised. J.V. had marks on his back, the home was unsanitary, and windows were broken. The caseworker sought a shelter care order.
Once the shelter care order was obtained, the children were placed with J. S.'s paternal grandmother. The Department left written notice at the mother's job that the children were in the Department's custody and warned her not to remove the children from the grandmother's home. However, the mother went directly from work to the grandmother's home and took the children. The police returned the children to the grandmother's custody.
The juvenile court granted temporary legal custody to the Department in April 1999. On April 2, 1999, the Department developed a plan for reunification, which had as a goal for the mother to obtain and maintain a residence which was free of hazards and had enough room for her and her children. The mother was also required to maintain an income that met the needs of her family and improve parenting, coping, and money management skills. She was to complete a family assessment and was to contact the caseworker twice a month to arrange visitation.
On April 14, 1999, the mother went to the grandmother's home again and took the children. The Department sought and received a protective order prohibiting the mother from interfering with the children's placement.
At the time the reunification plan was signed, the mother worked in a nursing home and lived in a trailer park. She later quit her job at the nursing home and moved out of the trailer and in with a girlfriend. She took another job at an air conditioning company, but was fired two days later. The mother worked at a health care facility, but when her car was repossessed and she had no means of getting to work, she quit. She worked at Krystal's Restaurant for several months and then quit that job after she suffered a back injury in a car accident.
In October 1999, the mother signed another case plan. The new plan contained most of the same goals, but, based on a July 1999 psychological evaluation, the mother was also required to undergo psychological counseling. She did not undergo any counseling, though, because she "didn't really pay attention to the mental part" of the case plan.
In February 2000, the Department amended the case plan to lead to reunification or, alternatively, termination and adoption. As of July 2000, the mother was unemployed, had no income, and had not visited the children regularly. Between March 1999 and December 2000, the mother missed more than half of her scheduled visits, even though the visits were scheduled in advance and the mother was given notice of the visits. While the mother usually cited transportation as the reason for the missed visits, she never asked her caseworker to transport her to the office and instead told her caseworker that she would borrow a friend's car. The mother slept during some of the visits. The mother never called the caseworker to inquire about the children's progress in school, never requested more visits, and never tried to discuss her progress on the case plan. The mother did not submit to psychological counseling as required by the case plan. The Department filed a petition to terminate the mother's rights in December 2000.
At the termination hearing, caseworkers testified that the children had expressed fear of the boyfriend because of his abuse of them and their mother. The mother was told about the children's fear, though she allowed the boyfriend to stay in the home and watch the children.
The paternal grandmother, who had custody of the children at the time of the hearing and for the preceding one and one-half years, testified that, except for the clothes the *728 mother bought the children two days before the termination hearing, the mother had not given her any money or gifts for the children. The psychologist who treated the children for the last one and one-half years believed that the children loved their mother, but that they wanted to stay with their grandmother. J.V. told the psychologist that he wanted to stay with his grandmother because he was upset by the violence he witnessed and experienced in his mother's home. J.V. informed the psychologist that the worst time in his life was when the boyfriend hit him, and the best time in his life is "when he's with his grandmother." The psychologist recommended that the children stay with the grandmother because "they're doing so well. They're thriving. They're doing well in school."
The mother contends that the Department failed to show sufficient evidence of parental misconduct or inability. She urges that although the children were deprived in April 1999, because she failed to protect the children from an abusive friend and left them unsupervised, there was little or no evidence that the deprivation was likely to continue or that termination would be in the best interests of the children.[1] She points to evidence that in March 2000, a caseworker noted that the mother had made significant progress in meeting the goals of the plan. The caseworker testified that the mother's employment (at Krystal's) was stable, as was her housing, and that her home was neat and clean. And an October 2000 evaluation of the home her father provided for her was favorable. The mother points to evidence that she completed a parenting class, that the children are attached to her, and that the guardian ad litem was in a "quandary" as to his recommendation. Although the mother acknowledged that she was unemployed from April 2000 through December 2000, when the hearing was held, she said she is not disabled and has been looking for work. Her father, she said, would continue to pay her bills if she does not find work. She testified that she had not seen the boyfriend since April 1999, but admitted that the children had witnessed him abusing her and were harmed by witnessing the violence against her.
Under OCGA § 15-11-94(a), the considerations for terminating parental rights involve a two-step process. The trial court must first determine whether there is present clear and convincing evidence of parental misconduct or inability.[2] Such misconduct or inability may be proved by showing: (1) the child is deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[3] Further, in determining whether there is a lack of proper parental care and control, the court may consider several factors, including the physical, mental, or emotional neglect of the children.[4] If the children are not in the custody of the parent in question, the lack of proper parental care and control can be demonstrated by showing that the parent, without justifiable cause, failed for a period of one year prior to the filing of the termination petition to develop and maintain a parental bond with the children in a meaningful, supportive manner or to support the children financially.[5] Once the trial court establishes a lack of parental care and control, the second part of the test for determining whether parental rights should be terminated is whether such termination is in the best interests of the children, after considering the physical, mental, emotional, and moral condition and needs of the children, including the need for a secure and stable home.[6] On appeal, we view the evidence in a light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that *729 the parent's rights should have been terminated.[7]
In this case, the mother has had little contact with the children since 1999, when they were first placed in foster care. She missed about half of her visitation appointments, including visits scheduled during holidays and birthdays, and slept during others. She has provided no financial support for the children. She has no job or means of supporting the children, only an expectation that her father will pay the family's bills. The mother did not receive any counseling, though a psychologist recommended it and the case plan expressly required it. A court-appointed special advocate who observed the hearing recommended termination.
The mother promises that she will eventually find a job and undergo counseling. However, she had nearly two years to accomplish the goals set out in the plan, but failed to achieve most of them. In fact, inasmuch as the Department actually became involved with the family in 1997, the mother had three and a half years to become a better parent to the children. The past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue.[8] The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.[9] Judging the credibility of the mother's good intentions was a task for the juvenile court.[10] The juvenile court was authorized to find from the evidence that, despite Department and family support, the mother lacked the requisite maturity, commitment, inclination, or ability to provide the proper parental care and control necessary for the children's physical, mental, and emotional health.[11] The evidence authorized the court to conclude that these conditions were likely to continue for the foreseeable future.[12] The court was also authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.[13] The juvenile court did not err in determining that the deprivation would likely continue if the children were returned to the mother's custody.
The same factors that show parental misconduct or inability can support a finding that termination of parental rights is in the children's best interests.[14] The mother's history belies her promises of future improvement. Moreover, the children's therapist testified that the children should remain with their grandmother because they were doing well in school and thriving. The court-appointed special advocate agreed. And, although the guardian ad litem initially testified that he was in a quandary as to his recommendation, he later testified that the grandmother should retain custody, though the court could "leave a door open for the mother."
Having reviewed the entire record, we conclude that sufficient clear and convincing evidence supports the juvenile court's termination of the mother's parental rights.[15]
Judgment affirmed.
RUFFIN and ELLINGTON, JJ., concur.
NOTES
[1] See OCGA § 15-11-94(b)(4)(A)(iii)-(iv).
[2] OCGA § 15-11-94(a).
[3] OCGA § 15-11-94(b)(4)(A).
[4] OCGA § 15-11-94(b)(4)(B)(v).
[5] OCGA § 15-11-94(b)(4)(C)(i)-(ii).
[6] OCGA § 15-11-94(a); see In the Interest of K.C., 249 Ga.App. 680, 681(1), 549 S.E.2d 737 (2001).
[7] In the Interest of T.B., 249 Ga.App. 283, 286(1), 548 S.E.2d 45 (2001).
[8] In the Interest of F.C., 248 Ga.App. 675, 678(1), 549 S.E.2d 125 (2001).
[9] Id.
[10] In the Interest of D.P., 244 Ga.App. 553, 558(2), 536 S.E.2d 225 (2000).
[11] In the Interest of B.R.W., 242 Ga.App. 232, 237(2), 530 S.E.2d 5 (2000).
[12] Id.
[13] See id. at 237-238(2), 530 S.E.2d 5.
[14] In the Interest of A.L.E., 248 Ga.App. 213, 219(2), 546 S.E.2d 319 (2001).
[15] See In the Interest of F.C., supra at 678(1), 549 S.E.2d 125.